IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NICHOLAS MARTIN HENDRICKSON,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER DENYING PETITIONER'S BIFURCATED MOTION TO SUPPRESS<br><br>Case No. 1:19-CR-35 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendant Nicholas Hendrickson's ("Defendant")

Motion to Suppress ("Motion"), which has been bifurcated. For the reasons below, the Court

will deny the bifurcated Motion.

## I. BACKGROUND

This case involves a vehicle search that resulted in seizure of a firearm and ammunition.

On May 13, 2018, Officer Applonie was on patrol when he heard a dispatch regarding a theft at

Sam's Club in Layton, Utah by a male in a black sports car.[1] Dispatch indicated that the theft

occurred about ten minutes prior and that the male had left the area headed toward Walmart.[2]

Officer Applonie, who was in the vicinity, drove around to see if he could spot the suspect

vehicle.[3] Within a few minutes of searching, he encountered a black Pontiac Firebird just east of

---

[1] *See* Docket No. 29, at 6–7.

[2] *See id.* at 6, 19.

[3] *See id.* at 6–7.

the Walmart, which he considered a possible match.[4]  Feeling he did not have sufficient information to initiate a traffic stop, Officer Applonie followed the vehicle until it backed into a cul-de-sac parking spot, some 150 to 200 feet from the nearest townhomes.[5]  Officer Applonie stopped his car some distance from the cul-de-sac and observed two males exit the Firebird—a white male driver with a shaved head and a male passenger with darker skin, dark hair, and a dark shirt.[6]  The men left the vicinity and, a few minutes later, walked back toward the Firebird again.[7]  Meanwhile an update from dispatch indicated two male suspects were involved with the theft, one of whom had darker hair and a black shirt.[8]  Officer Applonie felt he now had reasonable suspicion to stop and talk with the men who had exited the Firebird.[9]  He attempted, unsuccessfully, to locate them after they walked away from the Firebird a second time.[10]

Officer Applonie requested backup, and Officer Hallows responded.[11]  Officers Applonie and Hallows noticed a temporary permit on the vehicle and researched the vehicle identification number to identify its owner, which came back as Defendant Nicholas Hendrickson.[12]  The driver's license picture of Defendant appeared to match the white male driver Officer Applonie

---

[4] *See id.* at 7, 20.

[5] *See id.* at 7–8, 17–18, 34.

[6] *See id.* at 8–9.

[7] *See id.* at 8–10.

[8] *See id.* at 9.

[9] *See id.* at 10.

[10] *See id.*

[11] *See id.* at 12.

[12] *See id.* at 10–11, 35.

had observed earlier.[13]  Looking through the car windows, the officers noticed tools, exposed wiring, pliers, and Q-tips strewn about the interior.[14]  The Q-tips and pliers in particular made Officer Hallows suspicious that the vehicle was connected with some drug and/or theft activity.[15] Officer Hallows unlatched the driver's side door to see if it was unlocked, it popped open slightly, and Officer Hallows immediately closed the door.[16]  He did not enter or let anything inside the vehicle at this time.[17]  Officer Hallows called for a canine unit to see if a dog sniff would enable them to search the vehicle.[18]

While awaiting the canine unit, Officers Applonie and Hallows continued researching Defendant and discovered he was on parole at the time.[19]  Around this point, they also received updated information that the theft victim did not believe the black sports car in question was a Firebird.[20]  Upon hearing this, Officer Applonie questioned, "when she says I don't think it was a Firebird, does she know what a Firebird looks like?"[21]

---

[13] *See id.* at 11.

[14] *See id.* at 35; Government Exhibit No. 15 from October 16, 2019 hearing, "Dash cam video of Officer Hallows" at 23:35–23:46; Government Exhibit Nos. 7, 8.

[15] *See* Docket No. 29, at 36.

[16] *See id.* at 37–38, 51; Defendant's Exhibit F from October 16, 2019 hearing, "Dash cam video of Officer Applonie" at 15:38:10–15:38:13.

[17] *See* Docket No. 29, at 38; Defendant's Exhibit F, at 15:38:10–15:38:13.

[18] *See* Docket No. 29, at 37–38.

[19] *See id.* at 12–13.

[20] *See* Defendant's Exhibits H, F, at 15:45:57–15:46:11.

[21] *See id.*

Less than twenty minutes after Officer Hallows unlatched the Firebird's door, Deputy Dabb from the Davis County Sheriff's Office responded with a canine.[22] He deployed the canine to sniff the Firebird and later informed Officer Hallows that the canine "alerted" on the vehicle and they could now search it.[23] Inside the vehicle, officers found various items associated with methamphetamine, forms and identification with Defendant's name on them, and a model CF Hi-Point .380 handgun with a full magazine.[24] The gun was tucked away inside a shoe that was in a backpack behind the driver's seat.[25]

On March 28, 2019, Defendant was charged with one count of being a felon in possession of a firearm.[26] He filed the instant Motion on May 13, 2019.[27] On August 22, 2019, Defendant filed a Motion to Bifurcate the Proceedings Relative to the Motion to Suppress, requesting that the Court consider only issues related to law enforcement's initial investigation of the vehicle and request for a canine sniff test at this stage.[28] Defendant filed the Motion to Bifurcate due to scheduling conflicts with his potential expert witness regarding drug dogs.[29] On September 6, 2019, this Court granted the Motion to Bifurcate.[30]

---

[22] *See* Docket No. 29, at 38; Government Exhibit No. 15, at 16:50–35:25. In this footage, Officer Hallows arrived on the scene around the 16:50 minute mark, and the canine sniff test began around 35:25. This leaves at most an 18:35 minute lapse between when Officer Hallows could have unlatched the door and the canine sniff test.

[23] *See* Docket No. 29, at 38–39, 41.

[24] *See id.* at 42.

[25] *See id.*

[26] *See* Docket No. 1, at 1–2.

[27] Docket No. 16.

[28] *See* Docket No. 25, at 1–2.

[29] *See id.* at 2.

[30] Docket No. 26.

On October 16, 2019, this Court held an evidentiary hearing concerning the instant Motion.[31]  Officer Applonie, Officer Hallows, and defense investigator Matthew Alba testified.[32]  On November 6, 2019, Defendant filed his Memorandum in Support of Motion to Suppress, requesting suppression of the firearm and ammunition seized from his vehicle on May 13, 2018.[33]  The United States ("Government") filed its Memorandum in Opposition on November 27, 2019,[34] and Defendant filed his Reply on December 7, 2019.[35]

## II.  STANDARD

The Fourth Amendment states that:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[36]

Someone claiming that a search violated his Fourth Amendment rights must first establish that he had a reasonable expectation of privacy.[37]  The term "reasonable" is interchangeable with "legitimate" or "justifiable."[38]  "The courts have consistently held that the burden of establishing

---

[31] *See* Docket No. 27.

[32] *See* Docket No. 29, at 3.

[33] Docket No. 31, at 1.

[34] Docket No. 32.

[35] Docket No. 33.

[36] U.S. Const. amend. IV.

[37] *See e.g., United States v. Gordon*, 168 F.3d 1222, 1226 (10th Cir. 1999) ("Thus, we must determine whether Defendant had a reasonable expectation of privacy . . . . The burden is on Defendant to show that he had such an expectation.").

[38] *See e.g.*, *Smith v. Maryland*, 442 U.S. 735, 740 (1979) ("Consistently with *Katz,* this Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action.").

a legitimate expectation of privacy is on the party claiming a Fourth Amendment violation."[39]

The modern test for reasonable expectation of privacy analysis involves two questions:[40]

> The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy" . . . . The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable.'"[41]

Therefore, if a claimant did not hold an actual, subjective expectation that something would be private, or if his expectation was not a reasonable one that society is willing to recognize, an investigation into that thing is not considered a "search" under the Fourth Amendment.[42]

In addition to proving he had a reasonable expectation of privacy—and therefore, that a "search" occurred—a claimant must also prove that the search was unreasonable under the

---

[39] *United States v. Cavely*, 318 F.3d 987, 994 (10th Cir. 2003).

[40] *See Katz v. United States*, 389 U.S. 347, 361 (1967).

[41] *United States v. Knotts*, 460 U.S. 276, 281 (1983) (quoting Justice Harlan's concurring opinion in *Katz*, 389 U.S. at 361); *see also Kyllo v. United States,* 533 U.S. 27, 33 (2001) ("a Fourth Amendment search does *not* occur—even when the explicitly protected location of a *house* is concerned—unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'") (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)).

[42] *See Florida v. Riley,* 488 U.S. 445, 455 (1989) (O'Connor, J., concurring) ("In my view, the [claimant] must bear the burden of proving that his expectation of privacy was a reasonable one, and thus that a 'search' within the meaning of the Fourth Amendment even took place."); *Cavely*, 318 F.3d at 994 ("Absent a showing that the officers' entry on the property violated a reasonable expectation of privacy, their actions did not amount to a 'search' under the Fourth Amendment and their observations were a proper basis for a search warrant.").

Constitution.[43]  A search of a vehicle may be unreasonable where law enforcement has neither a warrant nor probable cause to justify it.[44]

Further, even where a search is deemed unreasonable—and therefore unconstitutional—there must be a "factual nexus between the illegality and the challenged evidence."[45]  If an illegal search did not cause discovery of the evidence a claimant seeks to suppress, this violation likely does not warrant suppression.[46]

## III.  DISCUSSION

The question presented is whether officers located the firearm and ammunition in Defendant's vehicle through an unconstitutional search.  Since the proceedings relative to the Motion have been bifurcated, this Court need address only potential Fourth Amendment violations leading up to the canine sniff test.[47]

---

[43] *See e.g., Rawlings v. Kentucky,* 448 U.S. 98, 104 (1980) (holding that someone claiming a Fourth Amendment violation "bears the burden of proving . . . that the search . . . was illegal").

[44] *See Carroll v. United States*, 267 U.S. 132, 149 (1925) ("On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid.").

[45] *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006) (quoting *United States v. Nava–Ramirez,* 210 F.3d 1128, 1131 (10th Cir. 2000)).

[46] *See id.* (quoting *Nava–Ramirez,* 210 F.3d at 1131) (finding that "[i]f evidence is attributed to a Fourth Amendment violation by [a] causal relationship, it may be tainted," but "[claimant] must show 'but for' causation; that 'the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct'").

[47] *See* Docket No. 25, at 2. ("Mr. Hendrickson requests this Court take evidence and argument as it relates only to the initial seizure and search (prior to the drug dog's arrival at the scene), to determine if the actions of law enforcement were lawful to that point.").

Defendant initially argues law enforcement lacked reasonable suspicion to "stop" his parked vehicle,[48] but he later concedes in his Reply that there was no "stop."[49]  Defendant argues law enforcement unlawfully searched his vehicle when Officer Hallows unlatched the door to check if it was locked.[50]  He further argues his vehicle was on private property, and law enforcement lacked a proper basis for pursuing a canine sniff test there.[51]

Government argues Defendant was on parole on May 13, 2018, making him subject to searches, with or without cause.[52]  Government further argues Officer Hallows' act of unlatching the car door was not a "search" under the Fourth Amendment, no evidence to "suppress" was gleaned from this act, the canine alert served as an independent means of searching the car that attenuates any prior illegality, and there was no but-for causal relationship between unlatching the door and later discovering contraband.[53]  Finally, Government argues Defendant has failed to establish a reasonable expectation of privacy in the premises searched, since he has not shown he had any interest in the property where his car was parked.[54]

Regarding his parole status, Defendant argues Government has failed to establish evidence concerning his parole agreement.[55]  This includes whether he signed it, its effective

---

[48] *See* Docket No. 31, at 4.

[49] *See* Docket No. 33, at 3 ("There was no 'stop' that occurred.  This was merely a random search of Mr. Hendrickson's vehicle on private property. . .").

[50] *See* Docket No. 31, at 5–7.

[51] *See id.* at 7–8.

[52] *See* Docket No. 32, at 5–6.

[53] *See id.* at 7–10.

[54] *See id.* at 10–14.

[55] *See* Docket No. 33, at 1–2.

date, whether the parole agreement contained clear and unambiguous terms, or any other information for the Court to determine whether the agreement complied with statutory requirements and how its terms might affect the present proceedings.[56]

At the outset, the Court agrees with Defendant that Government has not established sufficient information on the record concerning Defendant's parole status to deny the Motion on that basis. As such, the Court will examine the merits of the parties' Fourth Amendment arguments.

### 1. *Obtaining Canine Sniff Test*

Defendant can claim a Fourth Amendment privacy interest with respect to the Pontiac Firebird in two ways—that he had a privacy interest in the car itself, as personal property, and that he had a privacy interest in the location where the car was parked. The Court will first address whether obtaining a canine sniff test violated Defendant's Fourth Amendment rights with respect to any privacy interest in the car as his personal property.

It is on the record before this Court that the car in question was Defendant's car.[57] At the evidentiary hearing, Officer Applonie testified that he ran the temporary tag on the vehicle and discovered Defendant was the registered owner.[58] This brings it within Fourth Amendment protection, which defends the "right of the people to be secure in their persons, houses, papers,

---

[56] *See id.* at 1–6; Utah Code Ann. § 77-23-301(2)(a) ("The terms of the agreement under Subsection (1) shall be stated in clear and unambiguous language.").

[57] *See* Docket No. 29, at 11.

[58] *See id.*

and effects, against unreasonable searches and seizures" by the government.[59]  Defendant's car and other personal property are among his "effects" subject to protection.

Defendant's Motion to Bifurcate argues that "the initial seizure and request for the drug dog was not supported by reasonable suspicion,"[60] and his Memorandum in Support of Motion to Suppress reiterates that "no justification existed to ask for a canine search."[61]  The first question, therefore, is whether law enforcement was required to have a justification before requesting a canine search.  They were not.

A canine sniff by a properly trained dog is not considered a "search" under the Fourth Amendment.[62]  Tenth Circuit analysis of this matter is based on Supreme Court decisions indicating that "there is no intrusion on legitimate privacy interests (and hence no 'search') where the only information revealed is limited to contraband items."[63]  Therefore, unless officers

---

[59] U.S. Const. amend. IV.

[60] Docket No. 25, at 2.

[61] Docket No. 31, at 1.

[62] *See United States v. Morales-Zamora*, 914 F.2d 200, 205 (10th Cir. 1990) (holding that "police officers do not need individualized reasonable suspicion of drug-related criminal activity before subjecting a vehicle lawfully detained to a dog sniff"); *See United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993) (extending *Morales-Zamora* to hold that "even such random and suspicionless dog sniffs are not searches subject to the Fourth Amendment").

[63] *Morales-Zamora*, 914 F.2d at 204–05 (citing *United States v. Colyer*, 878 F.2d 469, 474 (D.C. Circuit 1989)) ("*Place* and *Jacobsen* stand for the proposition that a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed."); *see also United State v. Jacobsen*, 466 U.S. 109, 124 n.24 (1984) (explaining that governmental action that "did not intrude upon any legitimate privacy interests" because it "could reveal nothing about noncontraband items" is not a search subject to the Fourth Amendment); *United States v. Place*, 462 U.S. 696, 707 (1983) ("A 'canine sniff' by a well-trained narcotics detection dog . . . . does not expose noncontraband items that otherwise would remain hidden from public view . . . . Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search.  Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item.").

did something illegal in getting the dog to the car's location for the sniff test—such as intruding upon property where Defendant had a reasonable expectation of privacy—there is no Fourth Amendment violation here in obtaining that sniff test.

This brings us to Defendant's claim of Fourth Amendment violation with respect to the place where his car was parked. Defendant argues the police and canine's presence near the car for the sniff test was illegal because "the private property/parking area where [Defendant's] vehicle was located is similar to the curtilage of a home, which enjoys constitutional protections."[64] He argues that "[a]llowing this search would authorize a rule that law enforcement could snoop around vehicles and other personal property, located on private property (such as a driveway), and call out a K-9 to allegedly 'indicate' in order to search anything they wanted."[65] Certainly, it is settled law that police snooping in driveways and other parts of a home's curtilage violates the Fourth Amendment rights of persons having a reasonable expectation of privacy in that home—such as the home's owner.[66] However, the doctrine of "curtilage" is limited. It likely does not extend to the cul-de-sac in front of townhomes where

---

[64] Docket No. 31, at 7.

[65] *Id.* at 7–8.

[66] *See e.g., Florida v. Jardines*, 569 U.S. 1, 6 (2013) (holding that the right to retreat to one's home "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window" and therefore considering "[t]he area 'immediately surrounding and associated with the home'—what our cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes'") (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)); *Collins v. Virginia*, 138 S. Ct. 1663, 1667–68, 1671 (2018) (finding that an officer invaded a home's curtilage when he pulled the tarp off a motorcycle parked inside a "partially enclosed top portion of the driveway that abuts the house," violating the defendant's reasonable expectation of privacy in a home where he stayed a few nights per week).

Defendant claims a privacy interest.[67]  Even if it did, however, Defendant has not established that he has any relationship with these townhomes that would give him a reasonable expectation of privacy in any surrounding curtilage.

In an instructive Tenth Circuit case, an appellant moved to suppress evidence after police entered his property searching for someone else and observed items associated with methamphetamine manufacturing.[68]  The court found that

> [a] determination of whether a particular area lies within the curtilage depends upon a number of facts and factors, including "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."[69]

However, the record contained "no evidence on these matters, and appellant did not ask the court to make any findings with respect thereto."[70]  Noting that "courts have consistently held that the burden of establishing a legitimate expectation of privacy is on the party claiming a Fourth Amendment violation," the court "applied that same rule to a claimed invasion of the curtilage."[71]  Since the appellant failed to meet that burden, the court could find no Fourth Amendment violation.[72]  The same is true here, to an even greater degree.  Defendant has not shown that he has any relationship to any of the nearby townhomes.  The Court does not know

---

[67] *See e.g., Cavely*, 318 F.3d at 993–94.

[68] *See id.* at 992–93.

[69] *Id.* at 993–94 (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)).

[70] *Id.* at 994.

[71] *Id.*; *Riley,* 488 U.S. at 455 (O'Connor, J., concurring).

[72] *Cavely*, 318 F.3d at 994 ("Absent a showing that the officers' entry on the property violated a reasonable expectation of privacy, their actions did not amount to a 'search' under the Fourth Amendment and their observations were a proper basis for a search warrant.").

whether he perhaps lives in one, was visiting a friend, or ducked into a nearby cul-de-sac to evade police. As such, the Court finds that Defendant has failed to meet his burden of establishing a legitimate expectation of privacy in the parking location. Therefore, there can be no Fourth Amendment violation in law enforcement's request for and use of a canine sniff test there.

Regarding the canine sniff itself, "[a]n individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband."[73] Further, "a positive alert by a drug dog 'is generally enough, by itself, to give officers probable cause to search the vehicle.'"[74] However, the Court need not proceed to this point, as the question of probable cause is reserved for later proceedings.

### 2. *Unlatching Car Door*

Before the canine arrived, Officer Hallows unlatched the driver's side door to see if it was unlocked.[75] Defendant claims this was an unlawful search.[76] As noted above, Defendant had a Fourth Amendment right to protection against unreasonable search or seizure with respect

---

[73] *United States v. Johns*, 469 U.S. 478, 484 (1985) (quoting *United States v. Ross*, 456 U.S. 798, 823 (1982)).

[74] *Felders ex rel. Smedley v. Malcolm*, 755 F.3d 870, 880 (10th Cir. 2014) (quoting *United States v. Ludwig,* 641 F.3d 1243, 1250–51 (10th Cir. 2011)).

[75] *See* Docket No. 29, at 37–38.

[76] *See* Docket No. 31, at 6.

to his car.  Under the automobile exception of the Fourth Amendment,[77] Defendant's car could be searched without a warrant but only with probable cause.[78]

The Supreme Court has held that the automobile exception can apply even to parked vehicles—"the justification to conduct [a warrantless search of a vehicle] does not vanish once the car has been immobilized."[79]  The Court narrowed this holding in *Coolidge v. New Hampshire*, finding that a warrantless search of a suspect's car parked in his driveway was unreasonable where it was conducted after the suspect had been arrested.[80]  However, the Tenth Circuit found that this decision turned largely on the suspect's arrest prior to the vehicle search, which eliminated any exigency to justify applying the automobile exception.[81]  The Tenth

---

[77] Also referred to as the "motor vehicle exception." *See e.g.*, *California v. Carney*, 471 U.S. 386, 393 (1985).

[78] *See e.g.*, *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.") (citing *Carney*, 471 U.S. at 393); *Carroll*, 267 U.S. at 149.

[79] *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) ("It is thus clear that the justification to conduct [a warrantless search of a vehicle] does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant." ).

[80] *See* 403 U.S. 443, 461–62 (1971) ("The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears . . . . by no possible stretch of the legal imagination can this be made into a case where 'it is not practicable to secure a warrant,' and the 'automobile exception,' despite its label, is simply irrelevant") (citing *Carroll*, 267 U.S. at 153).

[81] *See United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993) ("*Coolidge* differs [from the present case] in several significant respects, however, the most important of which is that in *Coolidge* the suspect had been arrested before the search, whereas [the defendant in the present case] was arrested after the search.").

Circuit found that, on the other hand, police had authority to search a parked vehicle under the automobile exception where the driver had not been apprehended, explaining:

> The warrantless search of [the suspect's] car therefore is not unreasonable even if there was little or no risk that [the suspect] or a confederate would come out . . . and drive away. If police have probable cause to search a car, they need not get a search warrant first even if they have time and opportunity.[82]

When Officer Hallows unlatched the car door, it visibly opened to a small degree, and he immediately closed it.[83]  He did not enter the vehicle—or let anyone or anything else enter it—to investigate it at this time.[84]  This distinguishes the present case from *United States v. Montes-Ramos*, which Defendant provides as an exhibit in his Memorandum in Support of Motion to Suppress.[85]  Defendant argues that "[o]nce Officer Hallows opened the vehicle's door, an unlawful search occurred."[86]  However, it is not necessary to determine whether this act constituted an unlawful "search," since there is no evidence to suppress that was gleaned from it.

In order to suppress evidence obtained during a search, the party seeking suppression must show that any "evidence sought to be suppressed would not have come to light but for the

---

[82] *Id.*

[83] *See* Docket No. 29, at 37–38, 51; Defendant's Exhibit F, at 15:38:10–15:38:13.

[84] *See* Docket No. 29, at 38; Defendant's Exhibit F, at 15:38:10–15:38:13.

[85] *See* Docket No. 31-1; *United States v. Montes-Ramos*, 347 Fed. App'x. 383 (10th Cir. 2019).  In *Montes-Ramos*, the Tenth Circuit found it was a search under the Fourth Amendment when an officer "placed [his] nose-[his] face inside the [front passenger-side] door approximately two inches" to sniff inside the car and determine whether there was marijuana in the back seat. *Id.* at 385, 389–90 (alterations in original).  The court separately found the government had waived any argument concerning whether the search was reasonable—based on probable cause—by failing to address it properly in the district court or on appeal.  *Id.* at 390–94.

[86] Docket No. 31, at 6.

government's unconstitutional conduct."[87]  Tenth Circuit precedent establishes that this burden is upon the Defendant.[88]  He fails to meet it here.

Defendant argues that law enforcement would not have called for a canine had they not known the car door was unlocked, thus establishing a but-for link between unlatching the door and finding the firearm and ammunition in the car.[89]  Examining the record, this argument is unconvincing.

Officer Hallows testified concerning his thought process before requesting a canine:

So my initial thought, based on viewing what I perceived as possible burglary tools and the Q-tips that were associated with narcotics, as well as the recency of the vehicle leaving the area, my intent was to request a K-9 officer to either further confirm or dispel my suspicion that there may be illegal narcotics or items associated with that in the vehicle. Having said – in the event that there was a sniff from a K-9 that allowed us to search the vehicle, I didn't want to force entry into the vehicle, or break a window, or have to use a lockout kit in fear that I may damage the vehicle. And so I wanted to ensure that in the event that that K-9 did allow us to search the vehicle, that I could even access the vehicle at that point.[90]

Officer Hallows indicates that, before having assessed whether the car door was unlocked, his intent was to call for a canine.  He checked whether the door was unlocked to plan for the consequences, in the event the canine "alerted" on the vehicle.  However, there is no indication that finding the door locked would have prevented Officer Hallows from requesting a canine.

Furthermore, even if Defendant had established a but-for link between unlatching the door and requesting a canine, the firearm and ammunition still should not be suppressed.  The

---

[87] *Torres-Castro*, 470 F.3d at 999 (quoting *Nava–Ramirez,* 210 F.3d at 1131).

[88] *See id.*

[89] *See* Docket No. 33, at 6–7.

[90] Docket No. 29, at 37–38.

Supreme Court has held that "even when there is a Fourth Amendment violation, [the] exclusionary rule does not apply when the costs of exclusion outweigh its deterrent benefits."[91] This is because "[s]uppression of evidence . . . has always been our last resort, not our first impulse."[92]

The attenuation doctrine is a recognized exception to the exclusionary rule, and the Supreme Court analyzes its applicability under three factors: (1) "'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search," (2) "'the presence of intervening circumstances,'" and (3) "'particularly' significant, we examine 'the purpose and flagrancy of the official misconduct.'"[93]  Each factor is discussed below.

The first factor, as conceded by Government, weighs in Defendant's favor.[94]  There was little time lapse between Officer Hallows' unlatching the car door and the canine sniff test.[95]  In order for this factor to favor the government, there must be "substantial time" between any unlawful act and seizing of the evidence.[96]  The Supreme Court previously found that evidence should be suppressed in a case where there was less than two hours between the unlawful act and seizure.[97]  The under-twenty-minute gap at play here does not amount to "substantial time."

---

[91] *Utah v. Strieff*, 136 S. Ct. 2056, 2059 (2016).

[92] *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

[93] *Strieff*, 136 S. Ct. at 2061–62 (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

[94] *See* Docket No. 32, at 9.

[95] *See* Government Exhibit No. 15, at 16:50 – 35:25, revealing at most an 18:35 minute lapse between Officer Hallows' arrival on the scene and the canine sniff test.

[96] *See Strieff*, 136 S. Ct. at 2062.

[97] *See Brown*, 422 U.S. at 604.

The second factor weighs in Government's favor. The canine alert provides an intervening circumstance that attenuates the act of unlatching the car door from the seized contraband. In other words, the existence of a canine sniff test "favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'"[98]

The third factor also weighs for Government. The dash cam video footage reveals nothing "flagrant" about any potential police misconduct.[99] On the contrary, the officers' discussion sounds like a good-faith effort to lawfully conduct their duties. They can be heard discussing their suspicions that this was the vehicle involved in a recent theft.[100] These suspicions were based on observation from outside the vehicle of exposed wiring, Q-tips, and the fact that Officer Applonie encountered the vehicle—a black sports car—traveling from the area of the theft.[101] The officers discuss whether the automobile exception applies to the current situation,[102] first among themselves[103] and then with the canine handler who later arrived on scene.[104]

---

[98] *Strieff*, 136 S. Ct. at 2062 (quoting *Segura v. United States,* 468 U.S. 796, 804 (1984)). In *Strieff*, the Court found that existence of a valid arrest warrant, unconnected to an unlawful stop, was an intervening circumstance attenuating any connection between the stop and the discovery of contraband. Therefore, it favored admission of the evidence. *Id.* at 2062–63.

[99] *See* Government Exhibit No. 15, at 19:18–20:00, 23:35–23:46, 33:20–33:35.

[100] *See id.* at 23:35–23:46.

[101] *See id.*

[102] In the video footage, officers refer to the exception as the "mobile vehicle exception." *See id.* at 19:18–20:00, 33:20–33:35.

[103] *See id.* at 19:18–20:00.

[104] *See id.* at 33:20–33:35.

Defendant argues the officers' conduct was flagrant, because "[t]hey knew there was no connection to the purse snatching or any other unlawful conduct, which speaks to the flagrancy of their misconduct."[105] This argument is uncompelling for three reasons. First, as discussed above, the officers' discussions reveal good-faith efforts to comply with the law. Second, the officers' suspicions arose from the various items they observed in the vehicle that might have been related to other illegal activity, and they did not need to establish any connection between the purse snatching and their present suspicions to justify a canine sniff. Therefore, a claim that they "knew there was no connection" does not support an allegation of flagrancy. In fact, as discussed above, officers were not required to establish any standard of suspicion to conduct a canine sniff test. Third, before the canine arrived, officers were aware of Defendant's parole status.[106] Officer Hallows testified that he called Adult Probation and Parole to inform them of the circumstances.[107] This suggests the officers were dutifully following up on a parolee, rather than twisting rules to ensnare a suspect unconnected with the original theft.

Another relevant exception to the exclusionary rule is the independent source doctrine. This doctrine "allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source."[108] Here, unlatching the door did not result in discovery of evidence, and it has not been established that this act was a "search" under the Fourth Amendment. However, even assuming it was a "search," and imagining it had

---

[105] Docket No. 33, at 7.

[106] *See* Docket No. 29, at 12–13, 39, 46.

[107] *See id.* at 46.

[108] *Strieff*, 136 S. Ct. at 2061.

resulted in seizure of the firearm and ammunition, the independent source doctrine would apply to prevent exclusion. The Supreme Court explains the rationale for this doctrine as follows:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred . . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.[109]

Even given the hypothetical situation above, the canine sniff test would provide an independent source for discovering the firearm and ammunition. Therefore, this evidence need not be suppressed.

In addition, this case can be distinguished from situations where opening a car door before a canine sniff could invalidate the test. In *Felders ex rel. Smedley v. Malcolm*, an officer conducted a traffic stop and became suspicious that the car might contain drugs.[110] He asked passengers to exit and awaited a canine unit's arrival for a sniff test.[111] When the passengers exited, the officer deliberately prevented the car door from closing, which enabled the canine to enter the car rather than sniffing from its exterior.[112] The Tenth Circuit held that this is not a valid way to establish probable cause, and the act of "facilitating a dog's entry into a vehicle during a dog sniff constitutes an unconstitutional search."[113] Here, Officer Hallows' act of

---

[109] *Nix v. Williams,* 467 U.S. 431, 443 (1984) (internal citations omitted).

[110] *See Felders*, 755 F.3d at 875–76.

[111] *See id.* at 876–77.

[112] *See id.*

[113] *Id.* at 877.

unlatching then closing the door did not provide entry for the canine.  In fact, it concluded before the canine arrived on the scene.[114]

### 3. Alleged "Stop" of Parked Vehicle

A police officer must have reasonable suspicion before making an investigative "stop" of a person or vehicle.[115]  During the Motion hearing and in briefing, there was much discussion about whether officers had reasonable suspicion that the black Firebird could be the black sports car described by the theft victim.  This question is relevant only if the officers' initial investigation of the parked Firebird constituted a "stop" under the Fourth Amendment—that is, assuming the officers needed no justification to be standing where they were in the residential cul-de-sac, which is discussed above.  However, in his Reply, Defendant concedes that there was no "stop" here.[116]  Therefore, any question regarding reasonable suspicion that the Firebird was the black sports car in question is irrelevant, and the Court need not analyze this issue further.

## IV.  CONCLUSION

It is therefore

ORDERED that Defendant's bifurcated Motion to Suppress (Docket No. 16) is DENIED.  Pursuant to 18 U.S.C. § 3161(h)(1)(D), (H), the time from the filing of the Motion to the date of

---

[114] *See* Docket No. 29, at 37–38.

[115] *See United States v. Eylicio-Montoya*, 18 F.3d 845, 848 (10th Cir. 1994) ("It has long been settled that stopping an automobile and detaining its occupants constitute[s] a 'seizure' within the meaning of [the Fourth] Amendment. However, a brief investigative stop only requires some objective manifestation that the person stopped is . . . engaged in criminal activity," meaning "only reasonable suspicion is necessary.") (internal quotation marks and citations omitted) (alterations in original); *Terry v. Ohio*, 392 U.S. 1 (1968).

[116] *See* Docket No. 33, at 3 ("There was no 'stop' that occurred.").

this order is excluded from computation under the Speedy Trial Act. The parties are directed to

contact the Court to set a hearing concerning the canine's qualifications.

DATED this 6th day of January, 2020.

BY THE COURT:

_____

Ted Stewart
United States District Judge